Richard SCAMPONE, As Executor of the Estate of Madeline Scampone, Appellant

v.

GRANE HEALTHCARE COMPANY, Grane Associates, L.P., Highland Park Care Center, LLC, d/b/a Highland Park Care Center, Trebro Inc., Appellees.

Richard Scampone, Executor of Estate of Madeline Scampone, Appellee

v.

Grane Healthcare Company, Grane Associates, L.P., Highland Park Care Center, LLC, d/b/a Highland Park Care Center, Trebro Inc.

Appeal of Highland Park Care Center, LLC, d/b/a Highland Park Care Center, and Grane Healthcare Company, Appellants.

Superior Court of Pennsylvania.

Argued April 22, 2010.

Filed July 15, 2010.

968

Stephen Trzcinski, Peter Giglione, Wilkes & McHugh, P.A., Philadelphia, for appellant.

Michael Feeney, Pittsburgh, for appellees.

BEFORE: BOWES, DONOHUE and POPOVICH, JJ.

OPINION BY BOWES, J.:

¶ 1 This is an appeal and cross appeal from judgment entered on a $193,500 jury verdict rendered in favor of the plaintiff, Richard Scampone in his capacity as executor of the estate of Madeline Scampone ("Plaintiff"), in this action involving nursing home liability. We find that the evidence was sufficient to support a cause of action for corporate liability and that such liability can be imposed upon a nursing home. We also conclude that the trial court improperly granted nonsuit in favor of Grane Healthcare Company during the course of trial and that there was sufficient evidence of misconduct in this case to warrant submission of the issue of punitive damages to the jury. We reverse and remand for a new trial.

¶ 2 On September 22, 2005, Plaintiff instituted this action by *praecipe* for writ of summons against Grane Healthcare Company ("Grane"), Grane Associates, L.P., Highland Park Care Center, LLC d/b/a/ Highland Park Care Center ("Highland"), Trebro, Inc., and Ross J. Ness, who was the general partner of Grane Associates, L.P. Mr. Ross was dismissed by stipulation and order of court entered on March 27, 2006. The complaint was filed on November 15, 2005, and amended on December 7, 2005. From February 5, 1998, through January 30, 2004, Madeline Scampone ("Madeline"), was a resident of Highland Park Care Center, which is a nursing home facility owned by Highland Park Care Center, LLC. We will sometimes refer to Highland generically as the nursing home or the facility. Grane managed the nursing home. Grane Associates, L.P., and Trebro, Incorporated have an owner-ship interest in Highland Park Care Center.

¶ 3 The general factual background follows. When Madeline, aged eighty-eight, entered the nursing home in February 1998, she was in need of skilled nursing care and had a medical history that included senile dementia, depression, hypertension, atrial fibrillation, chronic obstructive pulmonary disease, diverticulosis, osteoporosis, diverticulitis, thoracic compression fracture, and a left hip replacement. The events that precipitated her death began in December 2003. On December 15, 2003, Madeline was diagnosed with a urinary tract infection ("UI"), and she was hospitalized, treated, and returned to the nursing home in good condition on December 18, 2003. Madeline was re-admitted to the hospital on January 30, 2004, and was diagnosed with another UI as well as dehydration, malnutrition, and bed sores. Madeline died of a heart attack at the age of ninety-four on February 9, 2004.

¶ 4 Plaintiff instituted this action and alleged that the UI, dehydration, and malnutrition caused Madeline's heart attack and that the defendants rendered substandard care. Plaintiff asserted that defendants were liable based both upon vicarious and corporate liability, the latter of which was premised upon the existence of chronic understaffing at the facility such that the employees were incapable of performing appropriate care to the nursing home residents, including Madeline. Plaintiff claimed that the defendants' substandard care caused the UI, dehydration, and malnutrition that led to Madeline's death. Punitive damages were also demanded.

¶ 5 The case proceeded to a jury trial, where Grane Healthcare Company, Grane Associates, L.P., and Trebro, Inc., were granted a compulsory nonsuit. In addi-

tion, the trial court concluded that the evidence was insufficient to submit the question of punitive damages to the jury. Thus, the case as to Highland was sent to the jury based upon both corporate and vicarious liability. The jurors returned the following verdict:

> QUESTION 1: Do you find that the defendant itself failed to oversee its nursing staff as to plaintiff's care?
>
> ANSWER: Yes.
>
> QUESTION 2: Do you find that the defendant itself had actual or constructive knowledge of the failure you found in Question 1?
>
> ANSWER: Yes.
>
> QUESTION 3: Do you find that the conduct of the defendant's employees fell below the applicable standard of care? In other words, were the employees of the defendant negligent?
>
> ANSWER: Yes.
>
> QUESTION 4: Was the defendant's negligence a factual cause of any harm to the plaintiff?
>
> ANSWER: Yes.
>
> QUESTION 5: State the amount of damages sustained by the plaintiff as a result of the negligence of the defendant.
>
> Wrongful death damages: $52,666.67.
>
> Survival Act damages: One hundred forty thousand—excuse me, $140,833.33
>
> Total: $193,500.

N.T. Trial Vol. V, 5/31/07–6/1/07, at 208–09. The jury therefore specifically determined that Highland was both corporately and vicariously liable for Madeline's death.

¶ 6 Following denial of post-trial motions and supplemental post-trial motions, Plaintiff filed the appeal at 2180 WDA 2007, and Highland filed the cross-appeal at 2301 WDA 2007. Plaintiff raises these issues for our review:

I. Did the trial court commit reversible error when it granted a motion for compulsory non-suit in favor of Defendant/Appellee Highland Park Care Center, LLC, d/b/a Highland Park Care Center ("Highland Park") on Plaintiff's claim for punitive damages?

II. Did the trial court commit reversible error when it granted a motion for compulsory non-suit in favor of Defendant/Appellee Grane Healthcare Company ("Grane Healthcare") on all of Plaintiff's claims, including his claim for punitive damages?

III. Did the trial court commit reversible error when it prohibited Plaintiff from presenting evidence and testimony that could have been used to support her claim for punitive damages, including statements of deficiencies by the Pennsylvania Department of Health, resident council meeting minutes, testimony that the director of nursing stole narcotic pain medication from residents and operated the facility while under the influence of the same, and testimony from various witnesses indicating that a high turnover of facility management negatively impacted resident care?

IV. Should the trial court be required to explain how the second question (above) was resolved, so that this issue may be properly briefed by the parties and analyzed by this court?

V. Should the trial court rule on Plaintiff's first supplemental motion for post-trial relief regarding evidence that Grane Healthcare wrongfully withheld during the

trial, so that this issue can be properly raised in this appeal?

Appellant's brief at 6.

¶ 7 The following contentions are presented in the cross-appeal:

A. Pennsylvania's appellate courts have consistently limited corporate negligence claims to hospitals and HMOs, not nursing homes, such as Highland Park Care Center.

B. There is no case law permitting a corporate negligence claim to be founded upon allegations of "understaffing."

C. Even if a corporate negligence claim founded upon allegations of understaffing may be brought against a nursing home, expert testimony is required to establish both that: (1) the facility breached the industry standard of care by not having sufficient staff to meet the needs of the resident; and (2) the alleged understaffing in fact caused harm to the resident.

D. A retrial of Plaintiff's vicarious liability claim is warranted due to the expansive, prejudicial, and misleading nature of the testimony, evidence, and argument that was presented in support of Plaintiff's corporate negligence claim.

Brief of Appellees and Cross–Appellants at i-ii.

¶ 8 We will discuss a few preliminary issues. Initially, we note that in this appeal, as clearly indicated in the above statement of issues presented on appeal, Plaintiff has not raised any allegations pertaining to the propriety of the nonsuit granted in favor of Grane Associates, L.P., and Trebro, Inc. Plaintiff challenges the grant of nonsuit only with respect to Grane Healthcare Company, which, as not-

ed, we will refer to as Grane in this adjudication.

¶ 9 We also can readily dispose of Plaintiff's fourth and fifth issues. In his fourth question raised on appeal, Plaintiff assails the sufficiency of the Pa.R.A.P. 1925(a) opinion prepared by the trial court. Specifically, Plaintiff maintains that we should remand so that the trial court can prepare a supplemental adjudication to explain its decision to grant nonsuit in favor of Grane. In *Cooke v. Equitable Life Assurance Society of U.S.*, 723 A.2d 723, 727 (Pa.Super.1999), we explained that ordinarily if a trial court has failed to address an issue raised in a Pa.R.A.P. 1925(b) statement, the remedy is "a remand to the trial court with directions that an opinion be prepared and returned to the appellate court." We continued that remand is unnecessary as long as the lack of an opinion does not impact upon our ability to conduct appellate review.

¶ 10 In the present case, we can resolve the issue of the propriety of the grant of nonsuit in favor of Grane without the necessity of explanation from the trial court. Our review of the evidence, which is conducted *infra* in connection with our discussion of whether Highland is entitled to judgment notwithstanding the verdict as to corporate liability, reveals that nonsuit should not have been entered in favor of Grane. Thus, we find it unnecessary to remand to the trial court to explain its ruling in this respect.

¶ 11 Plaintiff's fifth issue, concerning the trial court's failure to rule upon his supplemental post-trial motion raising an after-discovered evidence claim, was not included in Plaintiff's Pa.R.A.P. 1925(b) statement. That document contains only the first four issues raised on appeal. Thus, the averment that the trial court improperly neglected to rule upon Plaintiff's supplemental post-trial motion is waived. Pa.

R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement ... are waived."). Furthermore, it is rendered moot since we will be granting Plaintiff a new trial due to the improper grant of nonsuit in favor of Grane.

¶ 12 Hence, three questions remain to be resolved in connection with Plaintiff's appeal: 1) did the court err in granting Grane a nonsuit; 2) should the question of punitive damages have been submitted to the jury; and 3) whether the trial court committed error in refusing to admit certain evidence that was relevant to the issue of punitive damages.

¶ 13 Prior to reaching the merits of Plaintiff's first averment, we must address Highland's position that it has been waived. As noted, Plaintiff assails the trial court's determination that he failed to provide sufficient evidence to support his position that Grane was involved in the staffing and care failures leading to Madeline's death. However, Plaintiff wholly fails to set forth in his initial brief the evidence detailing the extent to which Grane was responsible for these conditions upon which Plaintiff premised liability in this matter. Instead, Plaintiff devotes two paragraphs in his brief arguing his position, Appellant's brief at 44, and rather than setting forth the evidence that he presented "detailing Grane Healthcare's involvement with the facility," Plaintiff refers us to the "evidence and trial testimony" that Plaintiff placed in his "post-trial motion papers." *Id.* at 44 n. 2.

¶ 14 In its brief, Grane argues that this issue is waived because it is undeveloped in the appellate brief. Grane's position is correct. Pa.R.A.P. 2119(d), which governs the contents of briefs relating to argument, clearly provides: "When the finding of, or the refusal to find, a fact is argued, the argument must contain a synopsis of all the evidence on the point, with a reference to the place in the record where the evidence may be found." A party cannot incorporate the contents of another document into his appellate brief and must fully develop his or her position in his appellate brief addressed to this Court. *Commonwealth v. Rodgers,* 413 Pa.Super. 498, 605 A.2d 1228, 1239 (1992) ("an appellate brief is simply not an appropriate vehicle for the incorporation by reference of matter appearing in previously filed legal documents"). Nevertheless, in his reply brief, Plaintiff has remedied this error by developing the position for purposes of this appeal. Plaintiff also points out that his failure to brief the position adequately in the initial brief was partially due to the lack of a trial court opinion explaining the ruling. We therefore decline to find waiver of the question of whether Grane was properly granted a nonsuit.

¶ 15 For the following reason, we have elected to next review the claims raised by Highland in its cross-appeal. Our review of the evidence at trial, which is necessary to resolve the third of Highland's positions, will also substantiate why nonsuit was improperly entered in favor of Grane and will provide the factual framework for analyzing Plaintiff's request for punitive damages.

¶ 16 Highland's first two arguments are that a claim for corporate negligence cannot be asserted against a nursing home and that an allegation of understaffing does not support a corporate negligence cause of action. Corporate negligence as a basis for liability against a hospital was first adopted by our Supreme Court in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). As we recently observed in *Hyrcza v. West Penn Allegheny Health System, Inc.,* 978 A.2d 961, 982 (Pa.Super.2009):

In *Thompson*, the Court found that a hospital could owe a non-delegable duty to uphold a certain standard of care directly to its patients, without requiring an injured party to establish the negligence of a third party. The basis for imposing direct liability on hospitals, as recognized by the Court, was that hospitals had "evolved into highly sophisticated corporations operating primarily on a fee-for-service basis. The corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." [*Thompson, supra,*] at 706.

In *Thompson*, the Court held that a hospital owes the following duties to its patients: (a) to use reasonable care in the maintenance of safe and adequate facilities and equipment; (b) to select and retain only competent physicians; (c) to oversee all persons who practice medicine within its walls as to patient care; and (d) to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients. [*Thompson, supra,*] at 707. The Court held that in order for a hospital to be charged with negligence, it was necessary to show that it had "actual or constructive knowledge of the defect or procedures which created the harm" and that the hospital's negligence was "a substantial factor in bringing about the harm to the injured party." [*Thompson, supra,*] at 708.

¶ 17 In *Shannon v. McNulty*, 718 A.2d 828 (Pa.Super.1998), we held that the doctrine of corporate liability announced in *Thompson* could be extended to health maintenance organizations. In so doing, we noted that "the *Thompson* court recognized 'the corporate hospital's role in the total health care of its patients.'" *Id.* at 835 (quoting in part *Thompson, supra* at 708). We analogized the role of a HMO to that of a hospital and recognized that just as a hospital, a HMO, even though it does not practice medicine, does play a "central role ... in the total health care of its subscribers." *Id.*

¶ 18 In our decision in *Hyrcza v. West Penn Allegheny Health System, Inc., supra*, we likewise extended a cause of action for corporate liability to a medical professional corporation. We concluded that such liability was appropriate in that case because the professional corporation in question "had total responsibility for the coordination of care within ... the rehabilitation unit" where plaintiff's decedent had been treated. *Id.* at 982. We noted that the evidence substantiated that the hospital where the rehabilitation unit was located had relinquished all control over medical care in that unit, which was administered separately from other hospital units, to the medical professional corporation in question. The professional corporation comprised doctors from different specialties. The professional corporation "oversaw and ran" the rehabilitation unit at the hospital and assumed "responsibility for the coordination and management of all patients." *Id.* at 982–83.

¶ 19 Any patient in the rehabilitation unit was assigned a doctor who worked for the medical professional corporation and who tailored the rehabilitation program for each patient. The rehabilitation program was implemented by employees of the medical professional corporation who bore the responsibility for consulting with physicians about the medical treatment needed by a patient. We observed that the medical professional corporation had all the duties of a hospital with the exception that it did not maintain the facility and equipment. Based upon the fact that the medical professional corporation at issue was a comprehensive health care provider

with the "responsibility for arranging and coordinating the total health care of its patients" and "was involved in daily decisions affecting its patients' medical care," we concluded that it was appropriate to impose corporate liability on that entity, consistent with *Thompson*.

¶ 20 On the other hand, in *Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55 (Pa.Super.2004), we refused to impose corporate liability upon a physician's out-patient office. We reasoned:

> We note that the policy considerations underlying the Pennsylvania Supreme Court's creation of the theory of corporate liability for hospitals are not present in the situation of a physician's office. In *Thompson*, the Supreme Court recognized that "the corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." *Id.* at 706. The same cannot be said for a physician's practice group. Accordingly, we decline ... to extend the negligence principles contemplated by *Thompson* to the case *sub judice*.

*Id.* at 62–63.

¶ 21 Herein, we conclude that a nursing home is analogous to a hospital in the level of its involvement in a patient's overall health care. Except for the hiring of doctors, a nursing home provides comprehensive and continual physical care for its patients. A nursing home is akin to a hospital rather than a physician's office, and the doctrine of corporate liability was appropriately applied in this case. Plaintiff's decedent was a full-time resident of the nursing home, and with the exception of occasional visits from her own doctor, Highland oversaw her care twenty-four hours a day, seven days a week. In addition, whenever a patient entered the facility, a Highland nurse assessed the patient

and developed the appropriate health care plan for that patient, including rehabilitative services. Highland was responsible for coordinating nearly all of the health care of its patients. Even though Highland did not have staff physicians, it was responsible for ensuring that all doctor-ordered testing was performed. Clearly, the degree of involvement in the care of patients of skilled nursing home facilities is markedly similar to that of a hospital and bears little resemblance to the sporadic care offered on an out-patient basis in a physician's office. Hence, we hold that the trial court correctly concluded a nursing home could be found liable under a corporate negligence theory.

¶ 22 In its second argument on appeal, Highland raises a series of challenges to the viability of Plaintiff's corporate liability claim against it. Highland first asserts that no "duty exits under *Thompson* in relation to staffing levels." Appellees' brief at 23. We disagree. One of the duties expressly imposed under *Thompson* is to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients. If a health care provider fails to hire adequate staff to perform the functions necessary to properly administer to a patient's needs, it has not enforced adequate policies to ensure quality care.

¶ 23 Our conclusion is reinforced by our Supreme Court's decision in *Welsh v. Bulger*, 548 Pa. 504, 698 A.2d 581 (1997), which involved a corporate negligence claim against a hospital. The hospital was sued for injuries caused to the plaintiff's son during his delivery; the baby subsequently died of complications from those injuries. Plaintiff premised liability on the vicarious actions of the hospital's employees in failing to monitor and respond to the fetal distress signals during the delivery. In addition, plaintiff raised an averment of

corporate liability that was premised upon an allegation that the hospital was negligent for permitting her doctor, who did not have obstetrical surgical privileges at the hospital, to deliver her baby without requiring a qualified surgeon to be available in the event surgery during a delivery became necessary. Plaintiff also averred that the hospital's staff had been negligent in failing to notify the hospital that her child needed to be delivered surgically. The trial court had granted summary judgment to the hospital, and after we affirmed, the Supreme Court granted review limited to the issue of "what type of evidence is necessary to establish a *prima facie* claim of corporate liability for negligence against a hospital pursuant to" *Thompson, supra. Welsh, supra* at 584.

¶ 24 Plaintiff had produced an expert witness who opined, *inter alia,* that the hospital was negligent for allowing the plaintiff's doctor to deliver babies knowing that he was not competent to perform surgery even though obstetrical surgeries are sometimes required during a baby's delivery and then failing to require a qualified surgeon to be available during that doctor's deliveries. The Supreme Court specifically concluded that this alleged staffing deficiency was sufficient to "establish a *prima facie* claim of corporate negligence against the hospital for ... failure to formulate and enforce policies to ensure quality care." *Id.* at 586. Hence, contrary to Highland's position on appeal, requiring it to hire enough staff to deliver sufficient health care to its patients is not expanding "the holding of *Thompson* by adding a fifth type of duty." Appellees' brief at 23 (emphasis omitted).

¶ 25 Highland also alleges that since Plaintiff's vicarious liability cause of action regarding improper treatment rendered to Madeline permitted recovery, the evidence relating to chronic understaffing "was superfluous and highly prejudicial." *Id.* at 24. Any given set of facts may support different theories of recovery. To state the obvious, merely because an entity can be held vicariously liable for the negligence of its employees does not obviate its liability for corporate negligence based upon its failure to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients. Plaintiff pled and, as discussed in more detail *infra,* supported a corporate liability cause of action based upon understaffing. Plaintiff was permitted to present his proof as to this cause of action regardless of the existence of evidence supporting a different theory of recovery.

¶ 26 Highland also maintains that it was impossible to rebut the "vague and conclusory testimony that understaffing at the Facility resulted in harm to other residents of the Facility." *Id.* at 24. Highland relies upon the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104–191, 110 Stat. 1936 (1996), as well as similar state privacy rules that prohibit the disclosure of patient health information. Highland continues by raising the specter of a due process violation and argues, "There was literally no way for Defendants to determine whether such testimony [about chronic understaffing] was truthful and, as a result, Defendants were defenseless and utterly exposed to such testimony, through no fault of their own." Appellee's brief at 25–26 (emphasis omitted).

¶ 27 Highland's hyperbolic and undeveloped argumentation about due process and privacy concerns are nothing more than attempts to divert this Court's attention to irrelevant concepts. Plaintiff presented a number of witnesses about understaffing at Highland. None of those witnesses revealed an iota of privileged information from any patient's health record. Com-

mensurately, there simply was no need for any rebuttal witnesses from Highland to reveal protected health care information.

¶ 28 Furthermore, Highland's due process argument is incorrect since it defended against Plaintiff's accusations of understaffing by offering its own witnesses to testify that the facility did have adequate staff to render appropriate care to the residents. The jury did not credit these witnesses.

¶ 29 Next, Highland suggests that the evidence relating to problems with other patients caused by understaffing was irrelevant. As our review of the evidence conducted *infra* will disclose, no other patients were specifically discussed. Rather, the witnesses established that they were unable to perform their duties due to a lack of adequate staffing. The evidence in question related to Highland's failure to formulate, adopt, and enforce adequate policies to ensure quality care for patients. Hence, we reject Highland's assertion that it was irrelevant.

¶ 30 Finally, Highland argues that a cause of action for understaffing is unnecessary because Pennsylvania and the federal government already have regulations "governing minimum staffing levels in skilled nursing care facilities." Appellee's brief at 26. A number of Plaintiff's witnesses established that Highland had advance notice of when a state inspector was due to arrive, artificially increased staff during those inspections, and then immediately reinstituted a reduced staff after the inspection was concluded. Plaintiff's evidence supported that the federal and state regulations were regularly ignored and that Highland avoided detection by state and federal agencies by manipulating staff levels during inspections. Since Plaintiff's evidence indicated that Highland violated the governmental regulations governing minimum staffing levels,

the cause of action in question herein is unquestionably viable.

¶ 31 Highland's third issue raised on appeal is that Plaintiff's evidence was insufficient to support the jury's determination that it was liable under the corporate negligence cause of action. Highland asserts that there was no evidence either that it breached the industry standard of care by not having sufficient staff to meet the needs of its residents or that the alleged understaffing caused Madeline's death. Highland thus maintains that it is entitled to judgment n.o.v.

"An appellate court will reverse a trial court's grant or denial of a JNOV only when the appellate court finds an abuse of discretion or an error of law." *Dooner v. DiDonato*, 601 Pa. 209, 971 A.2d 1187, 1193 (2009) (citing *Lockwood v. City of Pittsburgh*, 561 Pa. 515, 751 A.2d 1136, 1138 (2000)). "In reviewing the propriety of an order granting or denying judgment notwithstanding the verdict, we must determine whether there was sufficient competent evidence to sustain the verdict." *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 787 A.2d 376, 383 (2001). We view the evidence in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact. Any conflict in the evidence must be resolved in the verdict winner's favor. *Eichman v. McKeon*, 824 A.2d 305 (Pa.Super.2003).

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant.... [W]e must consider all of the evidence admitted to decide if there was suffi-

cient competent evidence to sustain the verdict. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm.... A JNOV should be entered only in a clear case.

*Griffin v. University of Pittsburgh Medical Center–Braddock Hosp.*, 950 A.2d 996, 999 (Pa.Super.2008).

*Simon v. Wyeth Pharmaceuticals, Inc.*, 989 A.2d 356, 364–65 (Pa.Super.2009).

¶ 32 We first set forth the general background information about the nursing home's operation. *See* N.T. Trial Vol. II, 5/14–18/07, at 57–118. There were three shifts each day at Highland: 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. The staff at the facility included registered nurses ("RN"), licensed practical nurses ("LPN"), and certified nursing assistants ("CNA"). The RNs performed the initial assessments for each new incoming patient, drew blood, administered intravenous medications and narcotics, reported critical problems to doctors, and oversaw the LPNs. They also received various daily reports, which are discussed in more detail, *infra*, about each patient.

¶ 33 LPNs gave oral medications other than narcotics and changed dressings. CNAs performed the remainder of the functions needed by the residents; these functions, known as activities of daily living, consisted of anything that the resident was unable to perform for his or herself. Examples of such activities included bathing, feeding, supplying water, changing diapers, and transportation to different areas for therapies or recreational activities.

There were supposed to be two LPNs and four CNAs on the 7:00 a.m. to 3:00 p.m. shift, and two LPNs and three CNAs on the other two shifts. *See id.* at 282.

¶ 34 There was one RN on each floor of the nursing home, which had approximately 145 patients. That RN was known as the unit manager. One nursing supervisor oversaw the entire facility; that person was known as the assistant director of nursing or the RN supervisor. After reports, which are described *infra*, were given to the RN unit manager, she or he conveyed them to the nursing supervisor, who was also responsible for calling additional staff if the nursing home did not have sufficient employees on a given shift. There were independent agencies available to provide temporary help. The Director of Nursing ("DON"), who was an RN, was the direct supervisor of the assistant director of nursing. Grane hired and trained all of the RNs. In addition, there was a nurse consultant who worked for Grane. The nurse consultant visited Highland weekly and oversaw the quality of patient care at the facility.

¶ 35 The CNAs were required to complete reports for each patient on each shift. These charts were to include all activities of daily living (the charts with be referred to as "ADLs") that the CNA conducted for each patient. Another report called a Medication Administration Record ("MAR") was completed for all medications given to a patient. Finally, there was a twenty-four-hour report. Since it was impossible to complete every service required by each patient in any given shift, if something a patient needed was not accomplished during a shift, that task was placed on the twenty-four-hour report so that the next oncoming RN unit manager would ensure its completion.

¶ 36 Danny Toledo[1] has a B.S. in nursing and was an RN unit manager who worked at Highland from 2002 to 2004. Mr. Toledo testified that during his tenure at Highland, he never was able to complete the tasks that he was supposed to perform. Mr. Toledo specifically requested assistance with intake assessment. He explained that most admissions occurred from 1:00 p.m. to 9:00 p.m., and he asked that an additional RN work each day during that time frame to handle assessments. That request was refused.

¶ 37 Mr. Toledo also reported that he received "many complaints" about not having enough CNAs. *Id.* at 85. CNAs specifically informed him that they did not have enough time to give patients water and to respond to call lights. *Id.* at 87. There were delays in feeding, and patients also were not receiving medications and were not able to reach their water. *Id.* at 106–09. Mr. Toledo testified that the facility did not have enough "helpers to take care of the residents more than three times a week." *Id.* at 101.

¶ 38 In addition, ADLs were not being completed. Mr. Toledo explained that omissions in the ADLs were significant because it was important to know a patient's intake of fluids and food. *Id.* at 111. Each patient was not receiving the state-mandated number of care hours that they were supposed to receive because there was less staff on evening and night shifts. *Id.* at 174.

¶ 39 State surveys were conducted periodically to inspect the facility and ensure proper patient care was being performed. Mr. Toledo related during direct examination that Highland avoided state sanctions for understaffing because it had advanced notice of state inspections and would temporarily increase staff levels during state inspections:

Q. Surveys, did the surveyors come into the facility?

A. Joint Commission?

Q. What's a survey?

A. A surveyor is somebody comes to make sure how are things getting done in the facility.

Q. Were you present when surveyors would come periodically to check on the facility?

A. Yes.

Q. Was the staffing levels, the number of caregivers increased because the surveyors were there?

A. For some reason the facilities get to know when surveyors are coming, yes.

Q. Did Highland Park Care Center know when they were coming?

A. As far as this facility, they would know when they were coming.

Q. When they knew that the surveyors were coming, what would Highland Park Care Center and the DON, director of nursing Ms. Luzik do?

A. As far as staff?

Q. Correct.

A. Yes.

Q. Yes what?

A. It was staffed. Numbers were up. Definitely the numbers were up.

Q. And once the surveyors left, what happened?

1. Mr. Toledo was fired in the following manner. RNs are not permitted to work more than two shifts continuously. One day, he had worked both the 7:00 a.m. to 3:00 p.m. and the 3:00 p.m. to 11:00 p.m. shift. When he had not been relieved at 1:00 a.m., he called Ms. Luzik, then the Director of Nursing. Ms. Luzik told him to continue working, so Mr. Toledo called her supervisor, the nursing home administrator. Ms. Luzik was angry that Mr. Toledo "went over her head," and he was fired. *Id.* at 63.

A. Back to an average normal day.

*Id.* at 113–14.

¶ 40 Mr. Toledo complained to the assistant director of nursing and to the director of nursing, who was Kim Luzik, and also to the nursing home administrator, Bernard Erb. *Id.* at 100–01. Mr. Toledo said he relayed all the complaints that he heard to his supervisors. *Id.* at 100. Specifically, "there was a stand-up meeting every morning in the first floor conference room with all the directors, with all the DONs [directors of nursing] in the facility." *Id.* at 101–02. Without discussing private patient matters, they would "go through what happened the day prior and what was the plan for the next day, and if something would happen some incident like that, then it would get reported to everybody." *Id.* at 102. The people present at those meetings included RN unit managers, the assistant director of nursing, the director of nurses, the nursing home administrator and other staff members. *Id.* at 102. Mr. Toledo stated that Ms. Luzik, the DON, knew about the incomplete ADLs. *Id.* at 112. Finally, Mr. Toledo confirmed that he knew Madeline and had worked in her unit during his tenure at the facility.

¶ 41 Mr. Toledo testified that Grane hired and trained him and that his clothing said, "Grane Healthcare Company." *Id.* at 165. He further related that Grane provided "the policies and procedures that you were supposed to follow at the facility." *Id.* Finally, the nurse consultant worked for Grane. Mr. Toledo delineated that when he worked at Highland, there were two nurse consultants, Beth Lengle and Tammy Payne. He explained that the nurse consultant came to the facility to make "sure that everything was taken care of and to do surveys on the chart and to make sure that the staff was doing what they were suppose to be doing." *Id.* at 176. Mr. Toledo testified that Ms. Payne "would go through the charts, make sure that policies and procedures were getting done correctly and the staff was assigned to what they were supposed to do and follow recommendations." *Id.* at 176. Mr. Toledo informed the jury that the purpose of the nurse consultant was to oversee the care being provided to the residents. *Id.*

¶ 42 Evelyn Johnson worked at Highland as a CNA from 2001–02 and then earned her LPN. She worked as an LPN at Highland from 2002–06. When she started working for the nursing home, Highland ran the facility. Then, "Grane bought it or took it over. It was Grane's facility. All services and everything was Grane." *Id.* at 292. Grane implemented the policies and procedures and operated the facility by 2004, when Madeline's improper care was rendered.

¶ 43 In 2003 and 2004, Ms. Johnson was the fourth floor LPN from 7:00 a.m. to 3:00 p.m. She had to take care of thirty-eight to forty residents, and had difficulties completing her job responsibilities. She informed DON Kathy Euwer and Kim Luzik about the problem but nothing was done. *Id.* at 285. Ms. Johnson confirmed Mr. Toledo's testimony that there was additional staff placed on duty when state surveyors came to inspect and after those inspections, the staffing levels were once again reduced. *Id.* at 286.

¶ 44 Ms. Johnson, who also indicated that the CNAs were supposed to pass water to the residents, was aware that sometimes that did not occur. When she worked on the fourth floor at Highland, the ADLs were incomplete. *Id.* at 289. Furthermore, Ms. Johnson was instructed by Highland's administrator to "fill in the holes" in the ADLs when the state supervisor was due to arrive. *Id.* at 291. She also personally saw other people filling in gaps in the ADLs. *Id.* Ms. Johnson also testified that any omissions in the MARs

were completed prior to state inspections. Ms. Johnson related that she was forced to sign the MAR documents that indicated that medications had been given when they had not. *Id.* at 293.

¶ 45 Karrin Holmes was a CNA who worked at Highland from 2003 until 2005. She helped care for Madeline from time to time and noticed untaken pills in her room. Ms. Holmes stated that the water pitcher was "always empty." *Id.* at 353. She confirmed that she was not able to do all the necessary functions for patients because there were not "enough CNAs." *Id.* at 356. Ms. Holmes also confirmed that the ADLs were not always complete, and that she had been instructed by Grane nurse consultants Beth Lengle and Tammy Payne to fill in blanks in the ADLs. *Id.* at 359–60. Ms. Holmes also stated that Highland would increase staffing temporarily when state surveyors came to inspect the facility. *Id.* at 362. She complained about the understaffing of CNAs "through the chain of command." *Id.* at 365.

¶ 46 Zenobi Scott was employed as a CNA by Highland from 2003 through 2004, and rendered care to Madeline. He was unable to perform his tasks, including at times, filling water pitchers. *Id.* at 41. Mr. Scott explained that "you didn't have enough staff to provide sufficient care." *Id.* at 417. He reported the problem at staff meetings, including when Kim Luzik, Director of Nursing, was present. Despite assurances otherwise, the problems were not addressed. *Id.* at 433. Mr. Scott also reported that when "the state came in, the staffing was increased[.]" *Id.* at 418. He also recalled that when there were blanks in the ADLs, he was told to falsify the records and fill in the omissions. *Id.* at 419.

¶ 47 Christine Kopyleck was an LPN who was trained by Grane to remedy pressure wounds and worked at Highland from 2001 to 2003. She stated that Madeline was treated the same as all other fourth-floor residents. *Id.* at 472. Even though she was hired to be only a wound-care nurse, Ms. Kopyleck related that the following happened during her tenure at Highland:

A. I was pulled a lot to the floor to be a floor nurse in addition to the wound care.

Q. Did you form an understanding as to why you would be pulled to the floor periodically to work as a floor nurse?

A. There wasn't enough nurses for that day.

Q. Would you be pulled to work the fourth floor?

A. Yes.

Q. And when you would get pulled to work the floor, were you still responsible for all your wound care duties?

A. Yes.

Q. Did you ever complain to any of the administration of Highland Park Care Center that you didn't have time to do all of those things?

A. Yes.

Q. And can you tell the jury who you complained to?

A. I complained to the director of nursing, Kathy Euwer. . . . I complained to our corporate wound care nurse, Tammy Payne.

Q. Anyone else you can think of?

A. My supervisor, Jan Davis.

Q. When you complained to the people you just told us about, would they get you some more help?

A. No.

Q. How would they respond?

A. They couldn't get any more help, I was enough.

*Id.* at 468–469.

¶ 48 Tammy Payne, who was a nurse consultant who worked for Grane, was at the facility each week. Ms. Kopyleck testified that the CNAs complained to Ms. Payne "a lot" about the fact that "[t]here wasn't enough of them for the amount of residents that we had." *Id.* at 472. Ms. Kopyleck confirmed the staffing level fluctuations during state inspections. She testified that there were always additional staff when the state inspectors arrived and after the inspections, the staffing levels would be reduced to normal. She also reported that omissions in MARs as well as treatment sheets would be completed. She complained to her superiors about the "holes" in the records. *Id.* at 478–479. Ms. Kopyleck also observed unadministered medications in the rooms of fourth-floor patients. Medications would be lying on residents, on the resident's nightstands, or in cups beside the residents. *Id.* at 480. She would check the MARs and those documents indicated that the medications "were given." *Id.* at 480.

¶ 49 Karolyn Knowlton was an RN who worked for Highland in 2003 and 2004 and left as a career move. She specialized in long term care and stressed the importance of initial and periodic assessments of patients to evaluate needed therapies and levels of care. The assessments identify patient risks and are used to develop a plan to ensure proper patient care. She stated that ADLs are critical in determining whether the patient's existing plan is sufficient to meet their needs or whether an updated assessment and plan need to be implemented. When she worked at Highland, Ms. Knowlton actually saw Kathy Euwer and Tammy Payne, who worked for Grane, "sitting together with some of the records, and they were going

back to the beginning of the month and putting their initials … in some empty spots on the documents" to signify treatment that had not been performed had been. *Id.* at 507, 508. The documents being altered were treatment records, and Ms. Knowlton reported the incident to Bernard Erb, the administrator. Additionally, Ms. Knowlton heard complaints from staff who did not have sufficient time to provide the care needed by the patients. *Id.* at 513. She also passed this information along to Mr. Erb, Kathy Euwer, and Kim Luzik.

¶ 50 At the time of trial, Michele Dixon was employed by Grane as a nurse consultant. She was hired by Grane in 2000. In that capacity, she went to nursing homes managed by Grane to consult with the nursing staff. Her purpose in conducting these consultations was to comply with a federally-mandated assessment that is known as a Minimum Data Set ("MDS"). She would audit the MDS's for accuracy. She would check what was written on the MDS and compare it with the patient's chart to determine if the two sets of data matched. Ms. Dixon confirmed that Tammy Payne and Beth Lengle also worked for Grane as nurse consultants during Madeline's tenure at Highland.

¶ 51 Through the testimony of Ed Francia, who had been an administrator at Highland, Plaintiff established that Grane approved of the budget for the nursing home and that anything remaining in Highland's bank account at the end of the month was swept into an account owned by Grane. *Id.* at 749–50. He confirmed that Grane employed the nurse consultants who were responsible for quality control and for ensuring staff members were performing their required functions at the facility. Bernard Erb, another administrator at the nursing home, stated that Leonard S. Oddo, who worked for Grane, was Mr.

Erb's "boss." N.T. Trial Vol. III, 5/21–24/07, at 301. Mr. Erb confirmed that Grane was both aware of and had budgetary approval over staffing levels at Highland. *Id.* at 233–37.

¶ 52 Leonard Oddo explained that Ross Ness was the president of Highland Park Care Center, LLC, and Mr. Ness also owned Grane. *Id.* at 580. Mr. Oddo acknowledged that Grane had to approve Highland's budget. *Id.* at 585, 587, 592. The management agreement between Grane and Highland required Grane to, "Establish and administer a quality assurance program to assure the facility [Highland] provides quality nursing services to its residents." *Id.* at 623. Grane further was charged with management of "all aspects of the operation" of Highland. *Id.* Plaintiff also introduced evidence that some of the state surveys revealed the existence of deficiencies in the nursing home and that Grane personnel were involved in remedying the problems.

¶ 53 Plaintiff's expert witness as to nursing home liability was Kathleen A. Hill–O'Neill. N.T. Trial Vol. III, 5/21–24/07, at 5. Ms. Hill–O'Neill, a gerontological nurse practitioner, was an RN since 1984. She earned a master's degree in nursing and started working in long term care of the elderly after becoming a nurse practitioner. In 1996, she received a certificate enabling her to be a nursing home administrator and also worked as a DON at a nursing home. She taught on the faculty at the University of Pennsylvania on how to take care of the elderly and develop treatment plans for those patients. She has rendered care at the skilled nursing level at nursing homes. In 2004, Ms. Hill–O'Neill became a nurse consultant. At the request of either federal authorities or the nursing home itself, she investigated and remedied problems at nursing homes with substandard surveys. Ms. Hill–O'Neill was qualified as an expert witness in the field of nursing and gerontological nursing. *Id.* at 15.

¶ 54 She testified as follows regarding the care rendered to Madeline after she was returned to Highland on December 18, 2003, from her hospital treatment for a UI:

Q. ... Based on your review of those records and your training and experience and education in the field of nursing and nursing homes, did you arrive at any opinions within the bounds of nursing probability as to whether or not the care for Ms. Madeline Scampone fell below the standard of care for a nursing home in Pennsylvania?

A. Yes, I did.

Q. And did you arrive at an opinion as to whether or not they fell below the standard of care based on the standards I just gave you with regard to following doctor's orders?

A. Yes, I did.

Q. And what about with regards to monitoring, assessing and preventing dehydration?

A. Yes, I did.

Q. What about in the area of monitoring, assessing and preventing infections?

A. Yes.

Q. And did you arrive at an opinion within the bounds of reasonable nursing probability and certainty as to whether or not they fell below the standard of care with regard to monitoring, assessing and preventing malnutrition?

A. Yes, I did.

Q. And did you come to an opinion within the bounds of reasonable medical certainty as to whether or not they fell below the standard of care with regards to responding ap-

propriately to significant changes in her condition?

A. Yes, I did.

Q. And did you come to an opinion as to whether or not they fell below the standard of care with regard to keeping up on an appropriate clinical record of her?

A. Yes.

Q. And what are your opinions with regard generally to those areas?

A. They fell below the standard of care in all of those areas.

Q. Did you arrive at an opinion within the bounds of reasonable nursing certainty as to whether or not [Madeline] was neglected and abused during her stay there?

A. Yes, I did.

Q. What's your opinion with regard to that?

A. She was neglected and abused during her stay.

*Id.* at 21–22.

¶ 55 Ms. Hill–O'Neill then delineated specifically that Madeline was not properly assessed and monitored for dehydration and that it could have been prevented. She explained that the following occurred. During November 2003, there was no record regarding Madeline's intake, and a UI test that was ordered by a doctor on November 21, 2003 was not performed. Madeline was admitted to the hospital on December 15, 2003, hallucinating and with a UI, and was returned to Highland on December 18, 2003, with "her mental baseline" intact. *Id.* at 46. At that time, Madeline was reassessed and was completely oriented as to time and place.

¶ 56 Ms. Hill–O'Neill stated that on December 18, 2003, Madeline was "very much with it." *Id.* at 53. On December 31, 2003, the doctor ordered another UI test. "It was not done." *Id.* at 56. By January 7, 2004, Madeline started to display signs of confusion, which can be a symptom of dehydration. *Id.* at 59. This "acute" change in condition should have triggered monitoring, which was not performed. *Id.* at 60. Rather, there were no nursing notes for a nineteen-day period, between January 7, 2004 and January 26, 2004. On January 29, 2004, Madeline was crying for water. Ms. Hill–O'Neill stated that Madeline was not adequately monitored for fluids after her return from the hospital, which was important due to her UI. After she was discharged from the hospital to the nursing home on December 18, 2003, Madeline also experienced a "significant weight loss" and the care rendered as to that issue was substandard." *Id.* at 84.

¶ 57 Ms. Hill–O'Neill opined that Madeline received substandard care with respect to the testing for a UI ordered on December 31st, monitoring for dehydration, and addressing the weight loss. That expert witness stated that Highland "significantly deviated" from the appropriate standard of care "within the bounds of reasonable nursing certainty" in all three respects. *Id.* at 91.

¶ 58 Plaintiff's other expert witness was Dr. Dean J. Nickles, a doctor of internal medicine who has cared for patients at nursing homes for twenty-six years. Dr. Nickles testified that the standard of care as to Madeline was not met when the UI testing was not performed after the December 31, 2003 test was ordered. Dr. Nickles continued:

Q. Did you take a look to see whether or not they met the standard of care as to following doctor's orders with regards to laboratories and getting laboratory samples and results?

A. The standard of care was not met. There was at least one important order that was not followed or at least

there's no documentation in the medical record that it was followed.

Q. Did you arrive at an opinion within the bounds of reasonable medical certainty as to whether or not they met the standard of care with regards to monitoring, assessing, and taking interventions and actions to prevent dehydration with regards to Mrs. Scampone?

A. Again, that standard was not met in a number of instances.

Q. Did you arrive at an opinion as to whether or not they met the standard of care with regards to monitoring, assessing, and preventing infections with regards to Mrs. Scampone?

A. Once again, that standard was not met.

Q. Did you arrive at an opinion as to whether or not they met the standard of care with regards to her nutritional situation?

A. That standard was also not met.

Q. Did you arrive at an opinion within the bounds of reasonable medical certainty as to whether or not they met the standard of care as to observing her, monitoring her, and responding to significant changes in her condition?

A. Again, documentation in the medical record indicates that that standard also was not met.

Q. And did you arrive at an opinion as to whether or not her clinical records were appropriately maintained and kept.

A. They were not appropriately maintained and kept.

. . . .

Q. And in this case, did you come up with any opinions within the bounds of reasonable medical certainty as to whether or not the failures in provid-

ing care that you just discussed in a general fashion substantially or significantly contributed to needless injuries, suffering, and death with regard to Mrs. Scampone?

A. I think that did occur.

Q. Do you think that within the bounds of reasonable medical certainty?

A. Yes, sir, I do.

Q. Can you explain that to the jury?

A. Well, specifically regarding her demise and death, I believe that the failures in the care at the nursing home resulted in conditions that ultimately led to her demise.

Q. What conditions are those?

A. Well, primarily two conditions. One was her urinary tract infection and, secondly, was her dehydration. Those were clear contributing factors in her ultimate demise.

*Id.* at 319–21.

¶ 59 Finally, Madeline's substandard treatment by the facility is supported by the testimony of Mr. Scampone and Suzanne Salisbury. Mr. Scampone frequently visited his mother and testified that she had difficulty getting water and pills and that her calls went unanswered. Ms. Salisbury, who had significant experience dealing with patients suffering from dehydration, was the paramedic who responded to the January 30, 2004 call that Madeline needed ambulance transport to a hospital. She presented a chilling description of Madeline's condition that day. When she arrived in Madeline's room, Ms. Salisbury noticed the smell "of urine was unbelievable." N.T. Jury Trial Vol. II, 5/14–18/07, at 18. Madeline had a Foley catheter, a rubber hose that is inserted into the urethra and leads from a bag to the bladder. It is used to measure the urine secreted by a patient and to determine if it contains blood or discoloration. Ms. Salisbury de-

scribed the catheter in Madeline as "putrid." *Id.* at 19. It contained a small amount of murky, thick urine. Thus, Madeline was not urinating. Ms. Salisbury also described that Madeline had severe skin tenting, which is a sign of dehydration. If a person is properly hydrated, their skin returns to its normal position after being pinched while the skin of a person suffering from dehydration tents, or stays upright, after being squeezed. Ms. Salisbury stated that in Madeline's case, she performed tenting on Madeline and "her skin stayed straight up in the air. It didn't move at all." *Id.* at 22. She performed the tenting several times to ensure it was not the result of age, and continued to observe the same "severe tenting." *Id.* at 30. Ms. Salisbury stated, "It was just sheer dehydration in my opinion." *Id.* The RN on duty informed the paramedic that Madeline had not been given any fluid "for quite a few days." *Id.* at 24. The RN also admitted that Madeline had been unable to swallow her medication for a "couple days." *Id.*

¶ 60 In *Welsh v. Bulger, supra* at 585, the Supreme Court outlined the elements of a cause of action for corporate negligence:

> Under *Thompson,* a hospital has the following duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients....
>
> "Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse,

to establish a cause of action in corporate negligence." *Moser v. Heistand,* 545 Pa. 554, 558, 681 A.2d 1322, 1325 (1996). Instead, corporate negligence is based on the negligent acts of the institution. *Moser.* A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. *Id.* Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts.

To establish a claim for corporate negligence against a hospital, a plaintiff must show that the hospital had actual or constructive knowledge of the defect or procedures that created the harm. *Thompson.* The plaintiff also must establish that the hospital's negligence was a substantial factor in causing the harm to the injured party. *Id.*

[W]here the defendant's negligence is not obvious, a plaintiff must present expert testimony to establish to a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm suffered.... [Therefore,] unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff.

¶ 61 As noted, Highland asserts that there was no evidence either that it breached the industry standard of care by not having sufficient staff to meet the needs of its residents or that the alleged understaffing caused Madeline's death. However, the nurse practitioner, Ms. Hill–O'Neill, testified clearly and unequivocally that Highland breached the standard of care applicable to nursing homes in vari-

ous respects. It did not conduct ordered testing, did not ensure that Madeline was consuming sufficient fluids, and did not ensure that Madeline was consuming sufficient food. In fact, Ms. Hill–O'Neill indicated that there was no record that Madeline received any nursing care for nineteen days after she started to show signs of a UI, dehydration, and an acute change in her condition that mandated such monitoring. Ms. Hill–O'Neill stated that the nursing home deviated from the standard of care applicable to nursing homes to a reasonable degree of certainty. This testimony met the requirements of the law. *Brodowski v. Ryave*, 885 A.2d 1045 (Pa.Super.2005) (where expert witness established that there was a lengthy breakdown in care rendered to decedent, that testimony was sufficient to establish corporate liability).

¶ 62 Plaintiff also presented evidence, which the jury chose to believe,[2] that these failures were caused by understaffing. A number of witnesses established that CNAs, LPNs, and RNs were unable to perform their required functions due to a chronically insufficient number of personnel necessary to complete all the assigned work. This staffing deficiency occurred during the pertinent time frame. These witnesses worked on the fourth floor, where Madeline was located, and included Madeline within the parameters of this problem. As discussed *supra*, the existence of this persistent lack of adequate staffing constituted a violation of Highland's duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for its patients. The witnesses who established the existence of understaffing stated that the fact a prob-

lem existed in that regard was communicated to both Highland and Grane's nurse consultants.

¶ 63 Ms. Hill–O'Neill clearly opined that the nursing home's failures led to Madeline's untreated UI, dehydration, and malnutrition, and she was competent to testify about the standard of care applicable to nursing homes and that the deviation from the standard was the cause of Madeline's condition. *See Freed v. Geisinger Medical Center*, 601 Pa. 233, 971 A.2d 1202 (2009). Dr. Nickles, a doctor who was competent to testify regarding the matter, stated that the UI, dehydration, and malnutrition were contributing factors in Madeline's death.

¶ 64 We therefore reject Highland's claim that a corporate negligence cause of action against it was not sustained by the evidence. *See Hyrcza v. West Penn Allegheny Health System, Inc., supra* (where evidence established health care provider did not assign staff to monitor or provide plaintiff's decedent with medical care during period of patient's decline leading to death, it was sufficient to establish corporate liability).

¶ 65 Highland also contends that none of the evidence of understaffing was "ever casually connected to the care and treatment" of Madeline. Highland's brief at 35. This position is completely untenable. The witnesses established the existence of a chronic lack of sufficient employees at the Highland Park nursing home to provide sufficient care for all its residents. The RN who testified, Mr. Toledo, worked on Madeline's unit, was acquainted with her, and testified about understaffing during his tenure at the facility. Ms. Kopyleck, an LPN, stated that Madeline was treated

---

**2.** Highland continually impugns the credibility of Plaintiff's witnesses regarding the existence of understaffing by characterizing them as disgruntled former employees. However, we are required to accept those witnesses as credible for purposes of analyzing Highland's judgment n.o.v. claim.

the same as all other fourth-floor residents. Mr. Scott, a CNA, was employed by Highland from 2003 through 2004, and rendered care to Madeline. He was unable to perform his tasks, including at times, filling water pitchers. Another CNA, Ms. Holmes, who worked at Highland from 2003 until 2005, helped care for Madeline from time to time and noticed untaken pills in her room. Ms. Holmes also stated that Madeline's water pitcher was chronically empty. In 2003 and 2004, Ms. Johnson was the fourth floor LPN from 7:00 a.m. to 3:00 p.m. She had to take care of thirty-eight to forty residents, and had difficulties completing her job responsibilities. Since Madeline was a fourth floor resident at that time, Ms. Johnson's testimony necessarily included the care of Madeline. Mr. Scampone stated that his mother was not given water and pills. Ms. Hill–O'Neill established an absence of necessary RN care for nineteen days in January 2004. Ms. Salisbury's testimony revealed that Madeline was not given fluids for days prior to being transferred to the hospital where she died. We categorically reject Highland's position that Plaintiff never connected the understaffing to Madeline's care.

¶ 66 We now consider the propriety of the grant of nonsuit in favor of Grane, where we employ the following standard of review.

The plaintiff must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of plaintiff. Further, it has been long settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. However where it is clear a cause of action has not been established, a compulsory nonsuit is proper. We must, therefore, review the evidence to determine whether the order entering judgment of compulsory nonsuit was proper.

*Braun v. Target Corp.*, 983 A.2d 752, 764 (Pa.Super.2009) (quoting *Wu v. Spence*, 413 Pa.Super. 352, 605 A.2d 395, 396 (1992), *appeal dismissed as improvidently granted*, 534 Pa. 309, 632 A.2d 1294 (1993)).

¶ 67 As a review of the above evidence establishes, Grane actually was in charge of managing the nursing home and its employees oversaw the quality of patient care. Mr. Toledo explained that the nurse consultant, who was a Grane employee, came to the facility to make "sure that everything was taken care of and to do surveys on the chart and to make sure that the staff was doing what they were suppose to be doing." N.T. Trial Vol. II, 5/14–18/07, at 176. Mr. Toledo testified that Ms. Payne, the Grane nurse consultant during his employment at Highland, "would go through the charts, make sure that policies and procedures were getting done correctly and the staff was assigned to what they were supposed to do and follow recommendations." *Id.* at 176. Mr. Toledo informed the jury that the purpose of the nurse consultant was to oversee the care being provided to the residents. *Id.* The management agreement between Grane and Highland required Grane to, "Establish and administer a quality assurance program to assure the facility [Highland] provides quality nursing services to its residents." N.T. Trial Vol. III, 5/21–24/07, at 623. Grane further was charged with management of "all aspects of the operation" of Highland. *Id.* Highland set staffing levels, but Grane had budget approval, including over staffing levels, and according to Plaintiff's evidence, Grane's nurse consultants had been told by RNs, LPNs, and CNAs that they did not have enough people in those capacities to per-

form all the functions that patients needed. Grane appointed the DONs, and hired and trained the RNs. Mr. Ness is both the president of Highland and owns Grane. Thus, it is clear that nonsuit was improperly entered in favor of Grane in this action.

¶ 68 Grane argues that none of its employees had a direct hand in Madeline's care. Highland's brief at 48, 50. The evidence reflected that the RNs, LPNs, and CNAs were employed by Highland, and they provided the direct care needed by Madeline. Nevertheless, Plaintiff's evidence also established the following. The nurse consultants, who were Grane employees, were the supervisory personnel at the facility, and they were in charge of the quality of patient care and were responsible for ensuring that the Highland staff was doing what they were supposed to be doing. Grane had the power to fire the administrator of Highland and approved of the staffing levels set forth in Highland's budget. Plaintiff adduced evidence that Grane nurse consultants knew staffing levels were insufficient to meet the patients' needs. Thus, Grane had a direct supervisory role in the hands-on care rendered to Madeline. Grane actually controlled the care.

¶ 69 As we noted in *Sutherland v. Monongahela Valley Hosp.*, 856 A.2d 55, 62 (Pa.Super.2004):

> Pennsylvania law with regard to the vicarious liability of an employer for the acts of its employee was well summarized in *R.A. v. First Church of Christ*, 748 A.2d 692[, 699] (Pa.Super.2000), as follows:
>
> > It is well settled that an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment.

¶ 70 In this case, Grane is subject to vicarious liability for the acts and omissions of its agents regarding the quality of care rendered to patients at Highland. While the RNs, LPNs, and CNAs involved in Madeline's care were employees of Highland Park, the nurse consultants who supervised the nursing staff were employees of Grane. The nursing consultants were involved in the daily care of Madeline in that the consultants ensured that the nursing staff was carrying out its duties. Grane's nursing consultants failed to supervise the staff properly because the staff failed to ensure that Madeline had proper fluids, nourishment, and medication in the days leading up to her death. Further, Grane may be vicariously liable for the lack of care provided by the Highland Park nursing staff because of the oversight by Grane and its nursing consultants.

¶ 71 Grane is also subject to corporate liability for the understaffing based upon the extent of its corporate control over Highland. As noted, corporate negligence as a basis for liability has been supported as a cause of action against a hospital, *Thompson, supra*, a health maintenance organization when it was engaging in dispensing medical advice, *Shannon, supra*, and a medical professional corporation that had total responsibility for the coordination of care within the rehabilitation unit of the hospital, *Hyrcza, supra.* Corporate negligence as a basis for liability is supported as a cause of action against Grane because it was the entity that managed all aspects of the operation of the nursing facility. Grane had assumed the responsibility of a comprehensive health center, arranging and coordinating the total health care of the nursing facility residents. *See Thompson, supra* at 706.

¶ 72 While Highland employed the nursing staff, excluding the nursing consultants who were employed by and trained by

Grane, Grane established and administered a quality assurance program to ensure the nursing facility provided quality nursing care to its residents. Part of this program included establishing an operating budget for Highland, which in turn would staff the nursing facility according to Grane's budget recommendations. Additionally, employees of Grane worked at the nursing facility and oversaw the daily operation of the nursing staff and the administration of the facility. Grane hired the RNs and appointed the directors of nursing. Further, any money remaining in Highland's bank account at the end of the month was transferred to Grane. Grane's involvement with the operation of the nursing facility and its sway over Highland garnered them control over the total health care of the residents similar to the hospital, HMO, and medical professional corporation in the aforementioned cases.

▇▇▇ ¶ 73 Based upon Grane's control over the total health care of the residents, it owed certain duties to those residents as outlined in *Thompson*. Of particular importance to Grane were the duties to use reasonable care in the maintenance of safe and adequate facilities and equipment and to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the facility's residents.[3] *See Thompson, supra* at 707. In order for Scampone to charge Grane with negligence, he must demonstrate that Grane had actual or constructive knowledge of the defect in procedures which created the harm and that Grane's negligence was a substantial factor in bringing about the harm. Scampone established a cause of action for corporate negligence based on Grane's governance of the care of the residents at the nursing facility. Hence, nonsuit was improperly entered in Grane's favor.

▇▇▇ ¶ 74 We now address whether the evidence was sufficient to permit the jury to make an award of punitive damages, "an extreme remedy" available in only the "most exceptional matters." *Phillips v. Cricket Lighters*, 584 Pa. 179, 883 A.2d 439, 445 (2005) (citing *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1098 n. 14 (Pa.1985)), *rev'd on other grounds sub nom., Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800 (1989). The fact finder is permitted to award punitive damages when the plaintiff has established that the defendant "acted in an outrageous fashion" due to either an evil motive or in "reckless indifference to the rights of others." *Phillips, supra* at 445. *Accord Hutchison v. Luddy*, 582 Pa. 114, 870 A.2d 766, 770 (2005) (punitive damages appropriate only if plaintiff establishes defendant acted so outrageously that the defendant demonstrated "willful, wanton or reckless conduct"). "A defendant acts recklessly when 'his conduct creates an unreasonable risk of physical harm to another and such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Phillips, supra* at 445 (quoting in part *Hutchison, supra* at 771).

¶ 75 We conclude that Plaintiff's evidence established that both Highland and Grane acted with reckless disregard to the rights of others and created an unreasonable risk of physical harm to the residents of the nursing home. The record was replete with evidence that the facility was chronically understaffed and complaints from staff continually went unheeded. Grane and Highland employees not only were aware of the understaffing that was leading to improper patient care, they deliberately altered records to hide that substandard

---

**3.** The last duty was Grane's purpose for being at the Highland nursing facility.

care by altering ADLs that actually established certain care was not rendered. Records concerning the administration of medications were falsified. Staffing levels were increased during state inspections and then reduced after the inspection was concluded. Deliberately altering patient records to show care was rendered that was actually not is outrageous and warrants submission of the question of punitive damages to the jury. Other evidence supporting an award of punitive damages included Madeline's lack of nursing care for a critical nineteen days prior to her death and her deplorable condition on January 30, 2004. We also point to a note in her records that the poor woman was crying for water.

¶ 76 Highland contends that it cannot be found liable for punitive damages due to the operation of 40 P.S. § 1303.505, a provision of the Medical Care Availability and Reduction of Error Act:

> (a) **Award.**—Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b) **Gross negligence.**—A showing of gross negligence is insufficient to support an award of punitive damages.

This language tracks the test for punitive damages discussed in the case law. Thus, for the same reasons outlined above, we conclude that an award of punitive damages is not precluded by § 1303.505.

¶ 77 Highland further argues that it cannot be subject to punitive damages because its challenged conduct was unrelated to Madeline and solely involved other patients. We reject this argument. The evidence in question related to all residents of Highland; Madeline was clearly a resident of Highland during the time covered by these witnesses. In addition, as analyzed above, the effects of understaffing was specifically connected to Madeline's care.

¶ 78 For the foregoing reasons, we reverse the nonsuit granted to Grane as well as the trial court's refusal to submit to the jury the question of whether an award of punitive damages was appropriate. Based upon these decisions, any remaining issues are rendered moot.

¶ 79 Judgment reversed. Case remanded. Jurisdiction relinquished.