**Williams v. Willow Terrace**

*Ruben J. Krisztal, Peter, D. Giglione, Bennie Lazzara, Jr.* and *Stephen Trzcinski*, for plaintiff.
*Michael G. Sabo, John J. Snyder* and *Arthur B. Keppel*, for defendants.

JACKSON, *J.*, April 8, 2013—

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

This case is a wrongful death and survival action under 42 Pa.C.S.A. §§ 8301, 8302, brought by the plaintiff, Camay Williams, administratrix of the estate of Marcel Mackey (herein, appellee), who died after being cared for by the defendants Willow Terrace and Albert Einstein Health Network (herein, appellants). The procedural history of the case is as follows:

The suit was initiated by the appellee in the Court of

Common Pleas, Philadelphia County, Civil Division, March, 2009 (No. 03774). While it is impossible to adequately summarize a complaint of over 100 pages, in general, the appellee alleged that the various health care providers were negligent in their care and treatment of the decedent, Marcel Mackey thereby causing him harm. At the time of trial there were 10 named defendants: Willow Terrace; Albert Einstein Medical Center; Albert Einstein Health Network; Methodist Hospital; Thomas Jefferson University Hospitals; St. Agnes Continuing Care Center; St. Agnes Long Term Care, LLP; Mercy Health System; Hahnemann University Hospital; and Tenet HealthSystem Hahnemann, LCC.[1]

The testimony revealed that the decedent was born on October 8, 1939. He had a medical history of bilateral above the knee amputations, diabetes mellitus, multiple strokes, transient ischemic attacks, Bells Palsy, dementia, depression, hypertension, incontinence, anemia, peripheral vascular disease, and malabsorption. On March 3, 2007, at the age of 67 the decedent was admitted to Hahnemann University Hospital having not felt well for four to five days. His immediate complaints consisted of thirst and incontinence. Medical records indicate that the decedent had decreased movement on the right side resulting in a diagnosis of left middle cerebral artery stroke with aphasia. Moreover, a percutaneous endoscopic gastrostomy (PEG) tube was placed as the decedent could not swallow or eat. His chart reveals right pneumothorax, aspiration pneumonia, and episodes of diabetic ketoacidosis. Lab

---

1. Following a jury verdict against Willow Terrace and Albert Einstein Healthcare Network, the caption was amended by the court at the request of the parties found not liable on June 20, 2012.

work on March 20, 2007 indicated an albumin level of 1.8, indicating protein malnutrition. Finally, during the decedent's stay at Hahnemann University Hospital, he developed a stage II pressure ulcer on his sacrum.

On March 21, 2007, the decedent was transferred to St. Agnes Long Term Acute Care Hospital. His medical charts show total right hemiparesis as well an MRSA infection pseudomonas on the stage II ulcer. Treatment for the ulcer consisted of debridement and IV antibiotics. The decedent also received occupational therapy, speech pathology, consultation from a dietician, NPH insulin, antidepressants, and dietary supplements. On April 23, 2007, the decedent was transferred to St. Agnes Skilled Nursing Facility where he received a similar course of treatment. During this time his prealbumin levels were on a downward trend and his albumin levels were not within normal limits.

On May 11, 2007, the decedent entered Methodist Hospital. He had an elevated white blood cell count of more than 30,000, acute incident of sepsis, hypertension, dehydration, protein malnutrition, a UTI, as well as right upper and middle lobe aspiration pneumonia. Likewise, his sacral decubitus ulcer continued to be a problem. The decedent was deemed stable for discharge on June 4, 2007. While his family expressed an interest in taking the decedent home, they did not appear for training and directed the hospital to transfer the decedent to Willow Terrace, a skilled nursing facility.

From June 4, 2007 to January 29, 2008, the decedent was a resident of Willow Terrace, with several brief

admissions to Albert Einstein Medical Center.[2] From January 29, 2008 to March 6, 2008, he remained at Albert Einstein Medical Center. While under the care of the Albert Einstein Healthcare Network, the decedent's chart reveals dehydration, protein malnutrition, recurrent aspiration with sequelae of aspiration pneumonia, the worsening of the pressure ulcers to the sacrum, poor hygiene, and infections.

The decedent was transferred to Montgomery Hospital on March 6, 2008 where he remained until his death on May 5, 2008. His death certificate lists the immediate cause of death as a severe end stage decubitus ulcer, skin breakdown, sepsis, failure to thrive, and metabolic encephalopathy. Other factors listed were hypertension and ventilator dependant respiratory failure.

The appellee argued at trial that the originally 10 named defendants were substandard in: care, staffing, assessments, oversight, and administration. Other than Methodist Hospital and Thomas Jefferson University Hospital, the jury found that all originally named defendants were negligent in the care and treatment of the decedent. On August 12, 2011, the jury found that only Willow Terrace (80%) and Albert Einstein Healthcare Network (20%) were the factual cause of harm. The jury awarded $1,500,000 in wrongful death damages (as well as $287,601 in stipulated past medical expenses under the wrongful death act) and $500,000 under the survival damages. 42 Pa.C.S.A. §§ 8301, 8302. Likewise, the jury found that the conduct of Willow Terrace and Albert Einstein Healthcare Network

2. Willow Terrace was under the control of Albert Einstein Medical Center, a tertiary acute care hospital. Both of these facilities are part of the Albert Einstein Health Network.

was "willful or wanton, or exhibited reckless indifference to the rights of the decedent."

On September 21, 2011, the jury awarded $400,000 in punitive damages against Willow Terrace and $100,000 in punitive damages against Albert Einstein Healthcare Network. On June 20, 2012, the caption was amended to its current form and the appellant's motions for a new trial or judgment notwithstanding the verdict were denied by this court. That same day, the appellee's "precautionary post trial motion" was marked as moot as the appellant's post trial motions were denied. By order docketed on August 7, 2012, this court found that delay damages were warranted in the amount of $114,000. As a result, the verdict was molded to $2,901,602 by the Honorable Sandra M. Moss on August 21, 2012 to reflect the above amounts.[3] Judgment on the molded verdict was entered by the appellee on August 27, 2012. Both parties appealed that entry of judgment.

On September 19, 2012, the appellants filed a notice of appeal to the Superior Court under 2856 EDA 2012, while on October 1, 2012 the appellee filed a notice of appeal under 2857 EDA 2012.[4] These cross appeals were consolidated by the Superior Court.

### THE APPELLEE'S APPEAL IS UNTIMELY

Pa. R.A.P. 903(a) demands that "notice of appeal... shall be filed within 30 days after the entry of the order from which the appeal is taken." Here, the appellee filed

---

3. The Honorable Sandra M. Moss handled the matter during a brief period in which this writer was not certified as a senior judge.

4. The appellee's 1925(b) statement refers to this as a "precautionary appeal"

a "precautionary appeal" on October 1, 2012, from an order docketed on August 27, 2012; The August 27, 2012 order is compliant with Pa. R.A.P. 108. Even giving any mathematical benefit of the doubt, the appellee has failed to meet the 30 day requirement of Pa. R.A.P. 903(a). As a result, the appellee's "precautionary appeal" should be quashed as untimely.

## THE APPELLANT'S APPEAL

In response to this court's Pa.R.A.P. § 1925(b) order for a concise statement of matters complained of on appeal, appellants delineated three matters for review. The first two matters address the punitive damages award and will be consolidated for the purposes of this opinion. The third matter complains of six separate trial errors. This court will address the appellant's complaints as follows:

1. Punitive Damages: "There is no question that the finding of liability for punitive damages is so against the weight of the evidence as to constitute a miscarriage of justice that shocks the conscience. The evidence presented during the Plaintiff's case-in-chief, even when viewed in a light most favorable to Plaintiff, falls short of the minimum required to warrant consideration of punitive damages as to compel the granting of a new trial so that right may be given another opportunity to prevail."[5]

As a preliminary matter, this court finds that this issue was preserved for appeal as the appellants moved for a non-suit and directed verdict on the issue of punitive damages; both were denied by this court. Likewise, this court denied the appellant's judgment notwithstanding the

5. Appellant's 1925(b) statement.

verdict and motion for a new trial at the post trial stage.

The appellants argue that viewing the evidence in the light most favorable to the appellee, the appellee failed to show that the appellants acted in an outrageous fashion with reckless indifference to the rights of the deceased.

> In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in the light most favorable to the verdict winner. Our standard[s] of review when considering the motions for a directed verdict and judgment notwithstanding the verdict [JNOV] are identical. We will reverse a trial court's grant or denial of a [directed verdict or JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

> There are two bases upon which a [directed verdict or JNOV] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Campisi v. Acme Markets, Inc.*, 2006 Pa. Super. 368, 915 A.2d 117, 119 (2006) (quotation omitted). *See Berg v.*

*Nationwide Mutual Insurance Co., Inc.*, 2012 Pa. Super. 88, 44 A.3d 1164 (2012).

Here, the appellee called numerous employees of Willow Terrace and Albert Einstein Healthcare Network. Sharron Tull, CNA, former an employee of Willow Terrace testified that dependant patients such as the decedent should be turned every two hours and that the repositioning should be recorded. N.T. 7/21/11 at 127-138. Ms. Tull went on to testify that there were portions of the decedent's chart which were completely void of any notation of repositioning. N.T. 7/21/11 at 143-146. Specifically, there were 33 eight hour shifts in August of 2007 in which there are no notations of repositioning. N.T. 7/21/11 at 144-146. Ms. Tull explained that she would complain of understaffing and that she would be pulled off of her floor without replacement. N.T. 7/21/11 at 148. Moreover, even with all staff present, it wasn't possible to reposition patients every two hours. N.T. 7/21/11 at 149. Finally, Ms. Tull testified that when State Inspectors visited Willow Terrace the nurses were notified and there was always more staff present. N.T. 7/21/11 at 151.

Next the appellee called Gail Clark, LPN, another former employee of Willow Terrace. Ms. Tull testified that the decedent appeared to be in a lot pain and that his ulcer was "so bad they were unstagable." N.T. 7/21/11 at 174. She described the ulcer as the size of a "place plate" and that it was infected, with a foul smell, and pus drainage. N.T. 7/21/11 at 177-180. Ms. Clark echoed that it was known that the decedent had to be repositioned every two hours or his wound worsen. N.T. 7/21/11 at 181. At Willow Terrace she was responsible for 30 patients a shift and would receive complaints from nursing aids

and patient's families that there was not enough help. N.T. 7/21/11 at 185-188. Like Ms. Tull, Ms. Clark testified that when the state inspectors came to Willow Terrace there would be more staff present. N.T. 7/21/11 at 193. When it came to wound care, Ms. Clark testified that when she would change the decedent's bandages, that it was evident the bandages were not be changed every shift as ordered by the doctor. N.T. 7/21/11 at 196.

Zenobia Teel, RN, formerly a Director of Nursing at Willow Terrace also testified that residents, families, and nurses complained of understaffing. N.T. 7/22/11 at 46. Ms. Teel testified that range of motion was required twice a day for the decedent, but it only happened three times total on the 3pm-11pm shift from July 1, 2007 to July 23, 2007. N.T. 7/22/11 at 71. Moreover, during the month of July, the decedent was documented as being repositioned only six times during the 3pm-11pm shift. N.T. 7/22/11 at 73-74. The decedent's Willow Terrace chart shows he was repositioned on October 23, 2007 and October 24, 2007 though, at that time he was at Albert Einstein Medical Center, not Willow Terrace. Ms. Teel agreed that there were incomplete chart entries revealing a lack of catheter care, showers, and skin assessments for the decedent. N.T. 7/22/11 at 81-84. Finally Ms. Teel detailed numerous deficiency citations Willow Terrace received from State Inspectors. N.T. 7/22/11 at 90-105.

Miriam Medina, RN, another former employee of Willow Terrance echoed complaints concerning understaffing, elaborating that they couldn't get everything done with four CNAs on the floor; at times one CNA would be pulled leaving only three. N.T. 7/22/11 at 158-162. She also testified that whenever state inspectors were

present there were was more staff. N.T. 7/22/11 at 162. Randy Crowder, a former Administrator of Willow Terrace testified that Willow Terrace received a citation from state inspectors on May 17, 2007 for failing to follow doctor's orders; the decedent arrived one month after the citation. N.T. 7/25/11 at 25-26.

The appellee also called Marquella White, RN, a former Restorative Manager at Willow Terrace as a hostile witness. N.T. 7/25/11 at 60. After cross examination, she recalled testifying during her deposition that nurses, residents, as well as resident's families complained of understaffing. Ms. White admitted that she passed those complaints onto the Director of Nursing, Ms. Teel. N.T. 7/25/11 at 72-74.

Beth Ann Lopresti, NP, worked for mobile wound consultants and visited Willow Terrace. N.T. 7/25/11 at 87-90. With the assistance of the decedent's charts Ms. Lopresti detailed how his ulcer got progressively worse from June 20, 2007 to January 23, 2008. N.T. 7/25/11 at 108-158. Specifically, the ulcer was 3.8 cm x 5.1 cm with a depth of 1mm on June 20, 2007. N.T. 7/25/11 at 108. At each assessment, the wound was bigger, while more purple, black, and/or brown tissue had developed; this included a foul odor, infection, and yellow exude. N.T. 7/25/11 at 117-123. On November 28, 2007 she found a new wound at the base of his penis. N.T. 7/25/11 at 152. On December 12, 2007 the ulcer was 23cm x 21cm with a depth of 3cm, she noted that "Sacral wound continues with copious drainage and foul odor. Wound continues to deteriorate and increase in size. Debridement, large amount of loose, foul smelling slough, with sterile scissors." N.T. 7/25/11 at 154-156. At her last assessment, on January 23,

2008, the ulcer had grown from 3.8 cm x 5.1 cm to 25cm x 28cm with a depth of more than 4.5cm. N.T. 7/25/11 at 158.

The appellee also called Dr. Loren Lipson who was accepted by this court as an expert in geriatrics; geriatric medicine; diabetes; internal medicine; long-term and nursing home care; nutrition; and federal and state regulations applicable to nursing homes. N.T. 7/26/11 at 17-19. Dr. Lipson testified that in his opinion both Willow Terrace and Albert Einstein Medical Center were "woefully below the standard of care." N.T. 7/27/11 at 53. Dr. Lipson also interpreted the death certificate, explaining that the ulcer, the ulcer's infection, failure to thrive, and delirium were the cause of death. Moreover, he opined that Willow Terrace and Albert Einstein Medical Center were the facilities which played a substantial role in the death of the decedent. N.T. 7/27/11 at 54-56.

Finally, Suzanne Frederick, RN, testified as an expert in nursing standards of care in hospitals, nursing homes, and home administration. She testified that Willow Terrace failed to assess and treat the decedent's pain, even though doctors had ordered premedication. N.T. 8/01/2011 at 93-98. In her review of the records she found that the real failure of Willow Terrace was the lack of turning and repositioning as well as lack of Foley catheter maintenance and range of motion tests. N.T. 8/01/2011 at 111-112. Ms. Frederick opined that repositioning is basic nursing care which was simply being ignored along with auditing their records and charts; not doing either was reckless and outrageous. N.T. 8/01/2011 at 22. Also outrageous was the fact that charts were filled out for the decedent at Willow Terrace while he was at Albert Einstein Medical Center.

N.T. 8/01/2011 at 126. Likewise, she testified that there appeared to be a lack of communication and supervision in regards to the worsening wound. N.T. 8/01/2011 at 135-136. Finally Ms. Frederick clarified that the various state and federal surveys (or deficiency notices) put Willow Terrace on notice that they were not meeting the standard of care. N.T. 8/02/2011 at 124.

Punitive damages are regarded as an extreme remedy which should be reserved for the most exceptional matters. *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 194 A.2d 1088 (1985). In such cases, the plaintiff is required to establish that the defendants acted in an outrageous fashion via "evil motive or reckless indifference to the rights others." *Id.* More specifically, the plaintiff must show that the conduct of the defendant was "so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766, 770 (2005). A defendant acts recklessly when "his conduct creates an unreasonable risk of physical harm to another . . . substantially greater than that which is necessary to make his conduct negligent." *Id.* at 771; *see also SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 587 A.2d 702, 704 (1991) (finding that even gross negligence will not suffice to establish punitive damages are warranted).

In *Scampone v. Grane Healthcare Co.*, our Superior Court found that the issue of punitive damages should have been submitted to the jury because the defendant's "acted with a reckless disregard to the right of others and created an unreasonable risk of harm." 2010 Pa. Super. 124, 11 A.3d 967 (2010), *aff'd on other grounds* 57 A.3d 582 (2012). There, the Superior Court panel cited the following:

The record was replete with evidence that the facility was chronically understaffed and complaints from staff continually went unheeded. Grane and Highland employees not only were aware of the understaffing that was leading to improper patient care, they deliberately altered records to hide that substandard care by altering ADLs that actually established certain care was not rendered. Records concerning the administration of medications were falsified. Staffing levels were increased during state inspections and then reduced after the inspection was concluded. Deliberately altering patient records to show care was rendered that was actually not is outrageous and warrants submission of the question of punitive damages to the jury. Other evidence supporting an award of punitive damages included Madeline's lack of nursing care for a critical nineteen days prior to her death and her deplorable condition on January 30, 2004.

*Id.* at P75; *see also Hall v. Episcopal Long Term Care*, 2012 Pa. Super. 205, 54 A.3d 381 (2012) (Also finding evidence of understaffing, increased staffing for state inspections, evidence of falsified logs, and lack of care justified submitting the question of punitive damages to the jury.)

Here, viewing the evidence in the light most favorable to the appellee, while accepting as true all evidence which supports the appellee's claim for punitive damages, the appellee established that the appellants acted in an outrageous fashion in reckless disregard to the rights of their patients and created an unreasonable risk of physical harm to the decedent. *Scampone, supra.* In the case at hand, a constant in the record is evidence of chronic understaffing

which was complained about by nurses, patients, and there families. Testimony revealed that this understaffing lead to an inability to properly care for patients. This is evidenced by the decedent's chart, which shows countless examples of him not being repositioned every two hours as medically required. For instance the decedent's medical charts showed countless instances of entire shifts where he was not repositioned. Specifically, testimony revealed 58 eight-hour shifts in which the decedent was never repositioned. That said, there was evidence in the charting that the decedent was "repositioned" at Willow Terrace when he was not present at the facility. The record reflects that the decedent's ulcer continually grew (3.8 cm x 5.1 cm to 25cm x 28cm with a depth of more than 4.5cm) while he was a patient at Willow Terrace; this ulcer was eventually listed as a cause of his death.

Based on the aforementioned there was more than enough evidence in the record to submit the question of punitive damages to the jury.

2. There were no Trial Errors

The appellants list six separate trial errors based on evidentiary rulings and request a new trial. A trial court's decisions on evidentiary rulings are controlled by its sound discretion and shall not be disturbed unless a clear abuse of discretion is demonstrated. *Sutherland v. Monongahela Valley Hospital*, 2004 Pa. Super. 245, 856 A.2d 55, 59 (2004). The standard of review for a trial court's evidentiary rulings are "extremely narrow" and may only be reversed upon a showing of a manifest abuse of discretion. *King v. Stefenelli*, 2004 Pa. Super. 438, 862 A.2d 666, 675 (2004). Even with a showing of an erroneous

ruling constituting a manifest abuse of discretion, the aggrieved party must also show the ruling was "harmful or prejudicial . . . For evidence to be admissible, it must be competent and relevant. Evidence is competent if it is material to the issue to be determined at trial. Evidence is relevant if it tends to prove or disprove a material fact." *American Future Systems, Inc. v. BBB*, 2005 Pa. Super. 103, 872 A.2d 1202, 1212 (2005).

In this case, there was no abuse of discretion committed by the trial court. The appellants have raised six separate objections which are discussed below in five categories.

This court properly barred reference to the appellant's not-for-profit status.

The appellants state that this court granted the appellee's motion *in Limine* (#11062036) to prevent appellants from informing the jury that they are not-for-profit entities. Appellant's 1925(b) response at 2. Here, this court determined that until the punitive damages stage of the trial that non-profit status was not relevant to the question of negligence. This evidence was not relevant to the issue of liability and would have had the potential to confuse the jury. Pa.R.E. 401-403. While this court originally stated the appellee's motion was denied, it clarified the opposite on the record. N.T. 7/20/2011 at 21. Further, the order in relation to this motion improperly states that the motion was denied.

All witnesses were sequestered

This court sequestered all witnesses at the beginning of trial. The appellant's appeal the instance when their expert was sequestered during the testimony of the appellee's

nursing expert Suzanne Frederick. N.T. 8/1/2011 at 5-7; appellant's 1925(b) response at 3. Pennsylvania Rule of Evidence 615 provides that "the court may order witnesses sequestered so that they cannot learn of the testimony of other witnesses." The trial court's decision to deny or grant a motion to sequester witnesses can only be overturned if there is a clear abuse of discretion. *Commonwealth v. Fant*, 480 Pa. 586, 391 A.2d 1040 (1978). Here, this court made a ruling to sequester all witnesses within its sound discretion.

Experts are permitted to testify within the scope of their knowledge

Appellee's experts, Dr. Loren Lipson and Suzanne Frederick, RN, testified that within their respective professions standard of care, that the conduct of the appellants was both reckless and outrageous. At no time did these experts testify as to punitive damages. Moreover, the appellants take issue with the fact that Ms. Frederick was allowed to testify that in reviewing the records, the deviations of Willow Terrace and Albert Einstein Healthcare Network resulted in an increased risk of harm to the decedent.

> The admission of expert testimony is within the trial court's sound discretion and we will not disturb that decision without a showing of manifest abuse of discretion. An expert's testimony on direct examination is to be limited to the fair scope of the expert's pre-trial report. In applying the fair scope rule, we focus on the word "fair." Departure from the expert's report becomes a concern if the trial testimony "would prevent the adversary from preparing a meaningful response, or

which would mislead the adversary as to the nature of the response." Therefore, the opposing party must be prejudiced as a result of the testimony going beyond the fair scope of the expert's report before admission of the testimony is considered reversible error.

*Coffey v. Minwax Company, Inc.*, 2000 Pa. Super. 395, 764 A.2d 616, 620-621 (2000). Here, the decision to allow the expert testimony as to standard of care was well within the sound discretion of this court.

Dr. Robert Perkel was not qualified to testify about nursing home standards of care

Dr. Robert Perkel was called as a appellant's expert and accepted as an expert in "primary care of medicine, both hospital-based and outpatient based, and geriatric medicine." N.T. 8/4/2011 at 98. On voir dire, Dr. Perkel testified that he had never been a medical director at a nursing home or long-term care facility; has never had any privileges to treat in a nursing home; and had not seen a patient in a nursing home in more than 20 years. N.T. 8/4/2011 at 100. Further, Dr. Perkel was not familiar with nursing home regulations and requirements. N.T. 8/4/2011 at 100-101.

A witness is qualified to testify as an expert in a particular field if they have the knowledge, skill, expertise, training, or education. Pa.R.E. 702. Here, Dr. Perkel had none of the aforementioned requirements to be accepted as an expert in nursing home standard of care. Like above, this determination was in the sound discretion of this court. *Coffey v. Minwax Company, supra.*

Stipulated medical expenses as part of wrongful death

The parties stipulated that the amount of past medical expenses was $287,601. N.T. 8/8/11 at 161-162. There was a disagreement as to how that should be reflected on the verdict sheet. N.T. 8/8/11 at 160-170. After hearing argument at the start of the charging conference, this court stated ". . . you work it out by tomorrow, because I am going back and forth with you. We are never going to get anything done this afternoon. So when you leave court today work it out and bring me what is an agreed upon verdict sheet. N.T. 8/8/11 at 170. The record does not contain any further discussion regarding the issue or an objection. The verdict sheet had a blank section for "wrongful death" and below it "past medical expenses under wrongful death act: $287,601".

A timely objection is required to preserve an issue for appeal, as the trial court must be given an opportunity to correct possible error prior to post-trial remedies. *Samuel-Bassett v. Kia Motors Am., Inc.*, 2011 Pa. LEXIS 2896, 34 A.3d 1 (Pa. 2011); *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974); Pa.R.C.P. 227.1(b). The Supreme Court of Pennsylvania found that a post-trial challenge to a jury's answers to special interrogatories was waived because it was not preserved by the required objection. *City of Philadelphia v. Gray*, 534 Pa. 467, 633 A.2d 1090 (1993). Here the record does not contain an objection and as such the issue was waived. That said, even if the appellant's had properly preserved the issue for appeal, the decision to include the "past medical expenses under wrongful death act" was within the sound discretion of this court and done so for the benefit of the jury. *Sutherland v. Monongahela Valley Hospital*, 2004 Pa. Super. 245, 856 A.2d 55, 59 (2004)

## CONCLUSION

For all of the above reasons, this court respectfully requests that the August 27, 2012 order, the decisions of this court, and jury, be affirmed.